Filed: 3/29/2017 10:12:34 AM
Lynne Finley
District Clerk
Collin County, Texas
By Helene Walkoviak Deputy
Envelope ID: 16136041

NO. __429-01491-2017__

| | | |
|---|---|---|
| **BEVERLY WALTON and TERRY WALTON** | § § § | **IN THE DISTRICT COURT OF** |
| **V.** | § § | **COLLIN COUNTY, TEXAS** |
| **BIOMET, INC., an Indiana corporation; and BIOMET ORTHOPEDICS, LLC, an Indiana limited liability company; BIOMET MANUFACTURING CORP., an Indiana corporation; and BIOMET U.S. RECONSTRUCTION, LLC, an Indiana limited liability company** | § § § § § § § § | **___ JUDICIAL DISTRICT** |

## PLAINTIFFS' ORIGINAL PETITION

COME NOW BEVERLY WALTON and TERRY WALTON, Plaintiffs herein, by and through their undersigned attorneys, complaining of BIOMET, INC., an Indiana corporation; and BIOMET ORTHOPEDICS, LLC, an Indiana limited liability company; BIOMET MANUFACTURING CORP., an Indiana corporation; BIOMET U.S. RECONSTRUCTION, LLC, an Indiana limited liability company, Defendants herein, and for cause of action says:

### Parties

1.      Plaintiff Beverly Walton ("Plaintiff") and Plaintiff Terry Walton ("Plaintiff Spouse") are individuals residing in Allen, Collin County, Texas and are citizens of the State of Texas.

2.      Defendant Biomet, Inc. is, and at all times material hereto was, a corporation organized under the laws of the state of Indiana, with its principal place of business in Indiana, a citizen of Indiana; and may be served with process by serving its president or officer at:

Biomet, Inc.
56 East Bell Drive
P.O. Box 587
Warsaw, Indiana 46581-0587

3.      Defendant Biomet Orthopedics, LLC is, and at all times material hereto was, a limited liability company organized under the laws of the State of Indiana, with its principal place of business in Indiana, a citizen of Indiana; and may be served with process by serving its registered agent for service:

Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company
211 E. 7th Street, Suite 620
Austin, TX 78701

4.      Defendant Biomet Manufacturing Corp. is, and at all times material hereto was, a corporation organized under the laws of the State of Indiana, with its principal place of business in Indiana, a citizen of Indiana; and may be served with process by serving its president or officer:

Biomet Manufacturing Corp.
56 East Bell Drive
P.O. Box 587
Warsaw, Indiana 46581-0587

5.      Defendant Biomet U.S. Reconstruction, LLC is, and at all times material hereto was, a limited liability company organized under the laws of the State of Indiana, with its principal place of business in Indiana, a citizen of Indiana; and may be served with process by serving its president or officer at:

Biomet U.S. Reconstruction, LLC
56 East Bell Drive
P.O. Box 587
Warsaw, Indiana 46581-0587

6.     Defendant Biomet, Inc., Defendant Biomet Orthopedics, LLC, Biomet Manufacturing Corp., and Biomet U.S. Reconstruction, LLC shall hereinafter, jointly and severally, be referred to as "Defendant."

## Jurisdiction

5.     This Court possesses jurisdiction over this cause of action because Defendant maintained sufficient minimum contacts with Texas such that the maintenance of jurisdiction over Defendant by Texas courts would not offend traditional notions of fair play and substantial justice.   Thus, this Court possesses general jurisdiction over Defendant.   Further, Plaintiff's claim arose out of events occurring in Texas.   Thus, this Court also possesses specific jurisdiction over Defendant.

## Venue

8.     This Court has venue over this lawsuit because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in Collin County, Texas.

## Statement of Facts Applicable to All Counts

9.     On or about January 6, 2004, Plaintiff received a Biomet 38 hip implant.

10.     The implant was designed, manufactured, marketed and sold by Defendant.

11.     The implant was approved by the United States Food and Drug Administration through the 510(k) process, rather than through the pre-market approval process.

12.     The pain caused by the implant resulted in Plaintiff compensating for that pain in how she walks.

14.     The implant shed metal particles.   As a result, Plaintiffs implant had to be removed.

3

15.    For more than five years, Defendants have known that their hip replacement device–the M2A-Magnum Hip Replacement System (hereafter, "Magnum Device")–is prone to fail years before its expected life.  They have also known that the implant's metal "ball" and "socket" bearings that make up the hip-joint generate metal debris over time from wear and tear that can spread throughout the patient's surrounding bone and tissue.  As a result of these defects, patients that have had the devices implanted have endured, or will endure, unnecessary pain and suffering; debilitating lack of mobility; inflammation, causing damage or death to surrounding tissue and bone; and a subsequent more difficult revision surgery to replace the faulty devices, giving rise to still more debilitation, a prolonged recovery time, and an increased risk of complications and death from surgery.  But rather than recalling the Magnum Device upon receiving notice of complaints made to the United States Food and Drug Administration ("FDA") regarding the defects discussed above, or warning physicians and patients of these risks and precautions such as metal level monitoring, Defendants continued to aggressively market the Magnum Device, claiming it was a safe and

effective hip replacement system.  Indeed, Defendants sought to capitalize on the problems with the competitor devices by asserting the superiority of the Magnum.

16.    The Magnum Device was developed in order to reconstruct human hip joints that are diseased due to conditions, such as osteoarthritis, rheumatoid arthritis, avascular necrosis (AVN), or fracture.  The hip joint connects the thigh (femur) bone of a patient's leg to the patient's pelvis.  The hip joint is like a ball that fits in a socket.  The socket portion of the hip is called the acetabulum.  The femoral head at the top of the femur bone rotates within the curved surface of the acetabulum.

17.    A total hip replacement implant device typically consists of four separate

components: a femoral stem, a femoral head (or ball), a liner, and an acetabular shell (socket). Usually these components are made of metal and plastic.

18.    The Magnum Device has only three components: a metal femoral head, a metal taper adapter, and a metal acetabulum cup.   The metal femoral head can be attached to a femoral stem to complete a total hip replacement.   As a result of the use of metal in the ball, taper adapter, and socket components, the device is referred to by the industry as a Metal-on-Metal (MoM) Implant Device.

19.    These devices were marketed wit the claim that they would last much longer than the conventional hip implant with a polyethylene liner.   Indeed, Defendants aggressively marketed the Magnum Device as having many advantages over other hip replacements or hip resurfacing systems.

20.    When initially released, Defendants promoted the device to surgeons as being "designed specifically to address the issue of wear debris" and held it out as "the right choice for use in young, highly active patients."

21.    Later, Defendants promoted the device as "offering improved range of motion and joint stability" and employed gymnast, Mary Lou Retton, to deliver the message in April 2006 for direct-to-consumer print, TV, and radio advertising.

22.    Even as other MoM devices came under scrutiny for their high rates of failure over the years, Defendants continued to falsely advertise the Magnum Device as a superior and safe device, citing biased and misleading studies and data indicating that the hip replacement was subject to reduced wear and revision.

23.    Defendants' represented that the Magnum Device presented optimal clearance between the "ball" and "socket" components.   Further, Defendants represented that the clearance

of the Magnum Device was neither excessive nor inadequate.

24.    Contrary to what Defendants' marketing campaigns suggest, for many years Defendants have known the risks inherent in MoM devices, including the Magnum Device and the metal on metal large diameter implant, the M2A 38, which were causing harm in a high number of patients who received them.    Specifically, for several years, the FDA had been receiving complaints that the Magnum Devices prematurely failed in some patients, due to component loosening, dislocation, component wear, and fracture, as a result of the design of the device.    In addition, reports were received that the implant's "ball" and "socket"–which are both metal bearings–generate metal debris over time from normal wear, and this debris can spread throughout the surrounding bone and tissue causing severe inflammation and damage.

25.    Indeed, since the start of 2006, the FDA has received an increasing number of complaints involving patients in the United States that received the Magnum Devices, with a number of these patients requiring complicated, expensive and painful revision surgeries with a prolonged recovery time.    Notwithstanding these complaints, Defendants neither halted sales of the Magnum Device nor warned the public.    Instead, they continue to aggressively market the Magnum Device

as safe and effective, even though they were on notice of the large number of complaints received by the FDA.

26.    Defendants were aware that the British Medicines and Healthcare Products Regulatory Agency (MHRA) and the United States Food and Drug Administration expressed concern about Metal-on-Metal hips and the impact of metal ions and thus Defendants, as part of industry trade groups, participated in discussion of studies of the health effects with other manufacturers during that time period.

27.    Despite its knowledge that the Magnum Device was defective, Defendants made several false representations about specific design elements of the Magnum Device that they claimed made it superior to other more safe hip implants on the market.   For example, Defendants claimed that:

(a)    "The M2a-Magnum⊆ Large Metal Articulation System offers optimal joint mechanic restoration and ultra low-wear rates in vivo," and

(b)    "Many studies conducted over the last several decades have shown no definitive correlation of negative health issues to ion levels exhibited from metal-on-metal implants."

28.    Defendants' reason to conceal the defect in its Magnum Device is clear.  Hip implant sales are critically important to Defendants, and the Magnum Device is one of its most profitable products.   During the time period relevant to this Complaint, Defendants' management was trying to make Defendants look appealing to investors, and in 2007, they were ultimately purchased by a private equity firm for $10 billion.

29.    Defendants were faced with a critical defect in one of its most profitable hip implant systems.   Rather than to admit that these popular products had a critical defect that could cause a premature failure, forcing patients to have to undergo another painful surgery, Defendants chose to pursue corporate profits, at the expense of patient safety, and continued to promote, market, and sell the Magnum Device despite the fact that they knew the product was defective. To this day, Defendants continue to sell these defective implants to unsuspecting patients without any warning about the risks or the failures that have been reported to the company.

30.    In 2011, the Australian Orthopedic Association published its annual report on data collected from the Australian National Joint Registry, which tracks surgical revisions of orthopedic devices in Australia (the United States does not have such a registry).   The Report

showed that the Magnum Device had a yearly cumulative revision rate of 7.2% after seven years, with a statistical range of 5.3% and 9.7%. This is a much higher revision rate than some other MoM hip replacements.

31.     Consequently, in May of 2011, the FDA required Defendants, and other manufacturers, to provide data on levels of metal in the blood of patients implanted with their MoM hip implants due to rising concerns regarding their use. The request followed the release of British studies from March 2010 showing that MoM implants, such as the Magnum Device, are potentially dangerous because they can generate large amounts of metallic debris as they wear over time. Metallic debris has been shown to cause severe inflammatory responses in some patients, resulting in pain in the groin, death of tissue in the hip joint, and loss of surrounding bone. These injuries often require revision surgery to replace the device before its expected expiration.

32.     In a systematic review of clinical trials, observational studies, and registries conducted by the FDA and published in the British Medical Journal on November 29, 2011, it was found that MoM hip implants are no more effective than traditional polyethylene-lined implants, and increase the risk of revision surgery. Therefore, MoM hip implants increase the safety risk to patients without providing any benefit over traditional hip implants. Due to this poor risk-benefit profile, sales of the Magnum Device have decreased substantially.

33.     As a result of the issues with the Magnum Device, Plaintiff has suffered symptoms including pain, swelling, inflammation, and damage to surrounding bone and tissue, and lack of mobility. As noted above, these symptoms are the result of loosening of the implant, where the implant pulls away from the bone of the hip socket; fracture, where the bone around the implant may have broken; dislocation, where two parts of the implant that move against each other are no

longer aligned; and the spread of metal debris generated from wear of the metal femoral head and metal acetabular cup.  For these reasons, revision surgery is necessary to remove the defective Magnum Device.  Revision surgery presents enormous risks because it is technically more difficult than the original implanting surgery, the patient has an increased risk of complications and death, and the recovery time is prolonged and more painful than the recovery after the original implanting surgery.

34.     After the surgical implantation of the Magnum Device, Plaintiff suffered symptoms including but not limited to increasingly debilitating pain, discomfort, soreness, dysfunction, and loss of range of motion.

35.     Plaintiff additionally suffered the following personal and economic injur(ies) as a result of the implantation with the Magnum Device:

(a)     underwent an additional surgical procedure that would not have been needed if the Magnum Device had performed satisfactorily during its expected usual life;

(b)     is permanently harmed by severe metal poisoning and metallosis from the metal debris of the Magnum Device;

(c )     lost wages and future loss of earning capacity;

(d)     incurred medical expenses and will incur additional medical expenses in the future and;

(e)     is permanently harmed, because of complications normally associated with a second hip replacement.

36.     Beyond merely providing the device to the surgeon, agents of Defendants were hired by Defendants to aggressively promote, distribute, and sell the Magnum Device.

37.     Directors, managers, and sales representatives of Defendants received training and education from Defendants, including orthopedic and surgical training, product design rationale

for the Magnum Device, education regarding proper use of the tools to implant the Magnum Device, selection of complementary components to the Magnum Device, and training on how to sell the Magnum Device to surgeons over hip replacements offered by competitors.

38.    On numerous occasions, Defendants met with orthopedic surgeons, including, on information and belief, with Plaintiff's orthopedic surgeon, to promote the M2a Magnum Hip Implant.    At some or all of these meetings, a representative or representatives of Biomet was present.    During these meeting, Biomet assured the orthopedic surgeons, including Plaintiff's orthopedic surgeon, that the M2a Magnum Hip System was safe, effective, was the best product on the market, had an excellent track record, would last longer than traditional hip implants and had a low and acceptable failure rate.    Biomet continued to "defend" the M2a Magnum Hip Implant even after they became aware of numerous and serious complications with the M2a Magnum Hip System.    Biomet did not reveal (and instead concealed) their knowledge of numerous and serious complications and other "bad data" during their meetings with orthopedic surgeons, including Plaintiff's orthopedic surgeon.

39.    Plaintiff's revision surgery has subjected her to much greater risks of future complications than she had before the revision surgery.    For example, several studies have found that a revision surgery causes a much higher risk of dislocation compared with an original hip replacement surgery.    In one study conducted by Charlotte Phillips and her colleagues at Brigham and Woman's Hospital in Boston, 14.4 percent of patients who underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients who underwent a original hip replacement surgery.    In other words, hip replacement patients who have undergone a revision surgery are almost four times more likely to suffer from a hip dislocation than those who have not. (Phillips CB, et al. Incidence rates of dislocation, pulmonary embolism, and deep infection during

the first six months after elective total hip replacement. *American Journal of Bone and Joint Surgery* 2003; 85:20-26).

40.     Defendants were instrumental in education Plaintiff's Orthopedic Surgeon regarding claimed advantages of the product, addressing the questions of the surgeon.

41.     Had Plaintiff or Plaintiff's surgeon known that the Magnum Device caused injury and had the potential to require revision surgery to remove the device, with no benefit over traditional hip implants, neither Plaintiff nor Plaintiff's surgeon would have chosen the Magnum Device for the hip implant surgery.   Rather, Plaintiff and Plaintiff's surgeon would have opted for the safer and more effective traditional hip implant utilizing a polyethylene liner.

42.     As a direct and proximate result of the implantation of the Magnum Device, Plaintiff has suffered significant harm, including but not limited to physical injury and bodily impairment, debilitating lack of mobility, conscious pain, elevated metal ion levels, suffering, and loss of earnings.   As a result, Plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

<u>**Count One**</u>

For strict liability cause of action against Defendant, Plaintiff says:

43.     Plaintiff adopts by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Petition as if fully copied and set forth at length herein.

44.     The implant contained a design or marketing defect, more particularly set forth below.

*Marketing Defect*

45.     The implant contained one or more marketing defects, among others:

ˇ11ˇ

(a)   there was an inherent risk in the intended or reasonably foreseeable use of the implant that the implant could shed metal particles, causing a local tissue reaction, including metallosis, as well as elevated chromium and cobalt levels;

(b)   there were inadequate warnings in that, among other things:

    (1)   the warnings failed to inform the user of the nature of the danger, such as that the implant could shed metal particles, causing a local tissue reaction, including metallosis, as well as elevated chromium and cobalt levels;

    (3)   Defendant represented that the implant was safe and effective

(c)   Defendant knew or reasonably foresaw (or should have known or reasonably foreseen) the above risk; and that the implant could shed metal particles, causing a local tissue reaction, including metallosis, as well as elevated chromium and cobalt levels.

(d)   Defendant failed to warn the consumer/physician (or to adequately warn the consumer/physician) of the above risk.

46.   Among other things, Defendant should have truthfully represented that the implant could shed metal particles, causing a local tissue reaction, including metallosis, as well as elevated chromium and cobalt levels.

47.   Defendants designed, manufactured, tested, marketed and distributed into the stream of commerce the Magnum Device.

48.   The Magnum Device placed into the stream of commerce by Defendants was defective due to inadequate warnings, because Defendants knew or should have known that the Magnum Device could fail early in patients and therefore give rise to physical injury, pain and suffering, debilitation, and the need for a revision surgery to replace the device with the attendant risks of complications and death from such further surgery, but failed to give consumers adequate warning of such risks.

49.   The Magnum Devise is unreasonably dangerous because it was sold to Plaintiff

without adequate warnings regarding, *inter alia*, the propensity of the Magnum Device to loosen and cause serious pain and necessitate additional surgery as well its propensity to generate metal debris resulting in metallosis and increased cobalt and chromium levels and damage to tissues and bone in patients.

50.    Further, the Magnum Device placed into the stream of commerce by Defendants was surgically implanted in a manner reasonably anticipated by Defendants.

51.    Defendants are strictly liable for Plaintiffs' injuries in the following ways:

   (a)    Defendants failed to warn and place adequate warnings and instructions on Magnum Device; and
   (b)    Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of the Magnum Device.

52.    As a direct and proximate result of Defendants' placement of the defective Magnum Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as an additional revision surgery to replace the device with the increased risks of complications and death from such further surgery.  Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

53.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of recipients of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting recipients of Defendants' Magnum Device.  Defendants' outrageous conduct warrants an award

of punitive damages.

*Design Defects*

54.     The implant contained one or more of the following design defects, among others:

(a)     in being made such that metal suffers would contact, or grind, so that the implant could shed metal particles, causing a local tissue reaction, including metallosis, as well as elevated chromium and cobalt levels.

55.     One or more of the following safer alternative designs for the implant existed that would have prevented or significantly reduced the risk of Plaintiff's injury without substantially impairing the product's utility, and that was economically and technologically feasible at the time the implant left Defendant's control by the application of existing or reasonably achievable scientific knowledge:

(a)     a design that did not have two metal surfaces contacting, or grinding;

(b)     a design that contained a non-metal liner.

56.     At all times herein mentioned, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed the Magnum Device as hereinabove described that was surgically implanted in Plaintiff.

57.     At all times herein mentioned, the Magnum Device was in an unsafe, defective, and inherently dangerous condition for users such as Plaintiff that had the device surgically implanted.

58.     The Magnum Device was in an unsafe, defective, and inherently dangerous condition at the time it left Defendants' possession.

59.     At all times herein mentioned, the Magnum Device was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was designed, produced, manufactured, sold, distributed, and marketed by Defendants.

˘14˘

60. The Magnum Device's unsafe, defective, and inherently dangerous condition was a cause of injury to Plaintiff.

61. The Magnum Device failed to perform as safely as an ordinary consumer would expected when used in an intended or reasonably foreseeable manner.

62. Plaintiff's injuries resulted from use of the Magnum Device that was both intended and reasonably foreseeable by Defendants.

63. At all times herein mentioned the Magnum Device posed a foreseeable risk of danger inherent in the design which greatly outweighed the benefits of that design.

64. At all times herein mentioned, the Magnum Device was defective and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by Defendants.

65. At all times herein mentioned, the Defendants knew, or should have known, that the Magnum Device was in a defective condition, and was and is inherently dangerous and unsafe.

66. At the time of the implantation of the Magnum Device into Plaintiff, the aforesaid product was being used for the purposes and in a manner normally intended, namely for use as a hip replacement device.

67. Defendants, with this knowledge, voluntarily designed their Magnum Device in a dangerous condition for use by the public and, in particular, Plaintiff.

68. At all times herein mentioned the Magnum Device lacked utility for any group of users, including Plaintiff.

69. The Magnum Device provided no net benefit to any class of patients, including Plaintiff.

70. Defendants had a duty to create a product that was not unreasonably dangerous for

its normal, intended use.

71.    Defendants failed to complete adequate pre-market testing and post-market surveillance on the Magnum Device;

72.    Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which, when used in its intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers and to Plaintiff, in particular, and Defendants are therefore strictly liable for the injuries sustained by Plaintiff.

73.    Defendants are strictly liable for Plaintiffs' injuries in the following ways:

(a)    The Magnum Device as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

(b)    Defendants failed to properly market, design, manufacture, distribute supply and sell the Magnum Device;

(c)    Defendants failed to adequately test the Magnum Device; and

(d)    A feasible alternative design existed that was capable of preventing Plaintiffs' injuries.

74.    As a direct and proximate result of Defendants' placement of the defective Magnum Device into the stream of commerce, Plaintiff experienced and/or will experience severe harmful effects including but not limited to partial or complete loss of mobility, loss of range of motion, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as an additional revision surgery to replace the device with the increased risks of complications and death from such further surgery.  Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

75.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of recipients of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting recipients of Defendants' Magnum Device.  Defendants' outrageous conduct warrants an award of punitive damages.

*Unreasonable Dangerousness*

76.    The manufacturing and marketing defects, or any of them, rendered the implant unreasonably dangerous by making the implant dangerous to an extent beyond that which would be contemplated by the ordinary consumer with the knowledge common to the community as to its characteristics.

77.    The design defect or defects rendered the implant unreasonably dangerous as designed considering the utility of the implant and the risks involved in its use.

*Producing Cause*

78.    The above defects, or any of them, were producing causes of Plaintiff's injuries and damages, more particularly set forth below.

## Count Two

For negligence cause of action against Defendant, Plaintiff says:

79.    Plaintiff adopts by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Petition as if fully copied and set forth at length herein.

80.    Defendant owed Plaintiff a duty of reasonable care.  Defendant owed Plaintiff a duty to exercise care to discover dangerous propensities of the implant.  Defendant owed Plaintiff a duty to exercise ordinary care in the design, production (manufacture) and sale (marketing) of the

implant.

81.  Defendant breached the duties it owed to Plaintiff, failed to exercise ordinary care, and was negligent in the following particulars, among others:

(a)  Negligently designing the Magnum Device with excessive or inadequate clearance between the "ball" and "socket" components;

(b)  Negligently designing the Magnum Device in such a way that it produces excessive wear thereby causing metal debris;

(c)  Designing, manufacturing, producing, creating, and/or promoting the Magnum Device without adequately, sufficiently, or thoroughly testing it, including both pre-market testing and post-market surveillance;

(d)  Not conducting sufficient testing programs to determine whether or not the aforesaid Magnum Device was safe for use;

(e)  Not conducting sufficient testing programs to determine whether or not the Magnum Device had optimal and safe clearance;

(f)  Selling the Magnum Device without making proper and sufficient tests to determine the dangers to its users;

(g)  Negligently failing to adequately and correctly warn Plaintiff or Plaintiff's physicians, hospitals and/or healthcare providers of the dangers of Magnum Device, including:

(1)  Negligently failing to warn of an increased risk of metallosis and/or metal poisoning;

(2)  Negligently failing to warn of an increased risk of elevated cobalt and chromium levels;

(3)  Negligently failing to warn of an increased risk of premature failure resulting in necessary revision surgery;

(4)  Negligently failing to warn of an increased risk of damage to surrounding tissue, bone, and/or nerves.

(h)  Failing to provide adequate instructions regarding safety precautions to be observed by surgeons who would reasonably and foreseeably implant the Magnum Device into their patients;

ˇ18ˇ

(i)    Negligently advertising and recommending the use of the Magnum Device despite the fact that Defendants knew or should have known of its dangerous propensities;

(j)    Negligently representing that the Magnum Device was safe for use for its intended purpose, when, in fact, it was unsafe;

(k)    Negligently manufacturing the Magnum Device in a manner which was dangerous to those individuals who had it implanted;

(l)    Negligently designing the Magnum Device in a manner which was dangerous to those individuals who had it implanted;

(m)    Defendants under-reported, underestimated and downplayed the serious dangers associated with the Magnum Device;

(n)    Failed to use due care in designing and manufacturing the Magnum Device so as to ensure optimal clearance and reduce the risk of metal wear and metal debris;

(o)    Failed to accompany their product with proper warnings;

(p)    Failed to accompany their product with proper instructions for use; and

(q)    Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of the Magnum Device.

82.    Each and every one of the foregoing acts or omissions, taken singularly or in any combination, proximately caused Plaintiff's injuries and damages, more particularly set forth below.

83.    Despite the fact that Defendants knew or should have known that the Magnum Device caused harm to individuals that had the device surgically implanted, Defendants continued to market, manufacture, distribute and/or sell the Magnum Device.

84.    Defendants knew or should have known that consumers such as Plaintiff would suffer foreseeable injury, and/or be at increased risk of suffering injury as a result of Defendants'

˘19˘

failure to exercise ordinary care, as set forth above.

85.     Defendants' negligence was the proximate cause of Plaintiff's physical, mental and emotional injuries and harm, and economic loss which Plaintiff has suffered and/or will continue to suffer.

86.     By reason of the foregoing, Plaintiff experienced and will continue to experience severe harmful effects as a result of the Defendants' negligence as set forth above.

87.     Further, as a result of the foregoing acts and omissions, Plaintiff has suffered and/or will in the future suffer lost wages and a diminished capacity to earn wages.

88.     Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of recipients of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting recipients of Defendants' Magnum Device.   Defendants' outrageous conduct warrants an award of punitive damages.

## Count Three

**For negligence misrepresentation cause of action, Plaintiff says:**

89.     Plaintiff adopts by reference each and every paragraph of the Statement of Facts Applicable to All Counts as it fully copied and set forth at length herein.

90.     Defendants supplied false information to the public, to Plaintiff and to Plaintiff's physicians regarding the high-quality, safety and effectiveness of the Magnum Device, including, statements of low wear, excellent stability, optimal clearance, 99.2% survivorship rate, revision rates of less than 2.5% and superiority over other metal-on-metal hip implants.   Defendants provided this false information to induce the public, Plaintiff and Plaintiff's physicians to purchase

and implant a Magnum Device.

91.    Defendants knew or should have known that the information they supplied, as set forth in the preceding paragraph, would induce Plaintiff and Plaintiff's physicians to purchase and use a Magnum Device was false and misleading.

92.    Defendants were negligent in obtaining or communicating this false information.

93.    Plaintiff and Plaintiff's physicians relied on the false information supplied by Defendants, as set forth above, to Plaintiff's detriment by causing the Magnum Device to be purchased and implanted in Plaintiff.

94.    Plaintiff and Plaintiff's physicians were justified in their reliance on the false information supplied by Defendants regarding statements of low wear, excellent stability, optimal clearance, 99.2% survivorship rate, revision rates of less than 2.5% and superiority over other metal-on-metal hip implants.

95.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff experienced and/or will experience significant damages, including but not limited to permanent physical injury, economic loss, pain and suffering and the need revision surgery to repair the physical damage to Plaintiff caused by the Magnum Device.

96.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of recipients of their products, including Plaintiffs, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting recipients of Defendants' Magnum Device.  Defendants' outrageous conduct warrants an award of punitive damages.

## Discovery

˅21˅

Plaintiff was unaware that her Biomet implants were defective until she learned in April 2015 or after of her elevated cobalt and chromium levels.

## Damages Applicable to All Counts

97.    Plaintiffs adopt by reference each and every Paragraph of the Statement of Facts Applicable to All Counts of this Petition as if fully copied and set forth at length herein.

98.    Plaintiffs hereby adopt by reference each and every Count of this Petition as if fully copied and set forth at length herein.

99.    Plaintiff suffered sustained and incurred, and in reasonable medical probability will suffer, sustain and incur, the following injuries and damages as a producing or proximate result (or both) of Defendant's conduct, the defective implant, or both, among others:

   (a)    physical pain, past and future;

   (b)    mental suffering, past and future;

   (c)    physical impairment, past and future;

   (d)    physical disfigurement, past and future;

   (e)    reasonable and necessary medical bills, past and future;

   (f)    loss of earnings/earning capacity, past and future;

   (g)    costs of court.

100.    Plaintiff Spouse suffered sustained and incurred, and in reasonable medical probability will suffer, sustain and incur, the following injuries and damages as a producing or proximate result (or both) of Defendant's conduct, the defective implant, or both, among others:

   (a)    loss of consortium, past and future;

   (b)    loss of household services, past and future.

## Jury Demand

Plaintiffs request trial by jury.

<u>**Prayer**</u>

Plaintiffs pray that Defendant be cited to appear herein, and that upon final trial, Plaintiffs

have judgment against Defendant for the following, among other things:

1.  Compensatory damages in an amount above the minimum jurisdictional limits of the Court;

2.  Punitive or exemplary damages in an amount above the minimum jurisdictional limits of the Court;

3.  Pre-judgment interest;

4.  Post-judgment interest;

5.  Costs of court;

6.  Such other and further relief to which Plaintiff shows himself justly entitled to receive.

Respectfully submitted,
**Houssiere, Durant & Houssiere, LLP**

By: _/s/Charles R. Houssiere, III_
  Charles R. Houssiere, III
  Lead Attorney
  choussiere@hdhtex.com
  Texas Bar No. 10050700
  Randal A. Kauffman
  rkauffman@hdhtex.com
  Texas Bar No. 11111700
  1990 Post Oak Blvd., Suite 800
  Houston, Texas 77056-3812
  Telephone: (713)626-3700
  Facsimile: (713)626-3709

ATTORNEYS FOR PLAINTIFF